IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION
No.: 7:18-cv-00086-FL

| | |
|---|---|
| PATRICK O'CONNELL, an individual; JASON CROWLEY, an individual,<br><br>           Plaintiffs,<br><br>     - against -<br><br>CITY OF NEW BERN, NORTH CAROLINA; TODD CONWAY, in his individual capacity acting as a police officer for the CITY OF NEW BERN, NORTH CAROLINA,<br><br>           Defendants. | **PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Fed. R. Civ. P. 56 |

COME NOW Plaintiffs, PATRICK O'CONNELL ("O'Connell") and JASON

CROWLEY ("Crowley"), individually (O'Connell and Crowley collectively "Plaintiffs"), by and

through their undersigned counsel and pursuant to Federal Rule of Civil Procedure 56 and Local

Rule 7.2, and hereby file their Memorandum in Support of their Motion for Summary Judgment.

## NATURE OF THE CASE

Plaintiffs filed their Complaint in this action (the "Complaint") asserting (1) a claim that

the City's Code, Division 2 – Picketing (the "Code"), on its face and as applied by Defendants

CITY OF NEW BERN, NORTH CAROLINA (the "City") and TODD CONWAY, in his

individual capacity acting as a police officer for the CITY OF NEW BERN, NORTH

CAROLINA ("Conway") (the City and Conway collectively "Defendants"), violates their right

to the freedom of speech under the First Amendment to the United States Constitution; (2) a

claim that the Code on its face and as applied by Defendants violates their right to the free

exercise of religion under the First Amendment; and (3) a claim that the Code on its face and as

applied by Defendants violates their right to the due process of law under the Fourteenth Amendment.

Specifically, in 2015, Plaintiffs were exercising their constitutional rights in a traditional public forum in the City by peacefully sharing their Christian faith with other members of the public at the MumFest festival ("MumFest"). (Plaintiffs' Statement of Undisputed Facts ("Statement") at ¶ 8). MumFest was free, open to the public, and was located in public streets and sidewalks of the City. (Statement at ¶¶ 6-7). Conway, acting under color of state law and with the approval and cooperation of the City (Statement at ¶ 88), enforced the Code by prohibiting the distribution of literature inside the festival grounds (Statement at ¶¶ 58, 60); preventing Plaintiffs from entering the festival grounds unless they first abandoned their cross outside the festival area (Statement at ¶¶ 9, 14, 24); forcing them to move from their location in a public street to another location farther away, in order to accommodate a street performer (Statement at ¶ 64); and impeding their message, in a public forum, by instructing two festival workers to park their trash utility cart in front of them and directing the workers to place the cart in reverse so that the "beep" warning would drown out Plaintiffs' message. Conway and the event workers then laughed together while the constant "beep" sound emanated from the cart. Later in the day, Conway continued his impediment to Plaintiffs' speech by returning with another utility cart that he was driving and engaging in the same activity to cause the constant "beep" with his cart. (Statement at ¶ 11).

Defendants' constitutional violations continued in 2017. In that year, O'Connell was exercising his constitutional rights in a traditional public forum in the City by peacefully sharing his Christian faith with other members of the public at MumFest. (Statement at ¶ 22). As in 2015, MumFest was free, open to the public, and was located in public streets and sidewalks of

the City. (Statement at ¶¶ 20-21). The City's officers, acting under color of state law and with the approval and cooperation of the City, enforced the Code by forcing O'Connell to take down his cross in order to remain inside the festival area. (Statement at ¶ 88, 74-75). This was so despite the fact that other members of the public were allowed to carry five-foot tall windmills inside the festival area. (Statement at ¶ 12).

The Code, on its face, violates Plaintiffs' First Amendment right to the freedom of speech, their First Amendment right to the free exercise of religion, and their Fourteenth Amendment right to the due process of law. In addition, Defendants' conduct in applying the City's Code to prevent Plaintiffs from sharing their faith in a public forum at Mumfest violated Plaintiffs' First Amendment right to the freedom of speech, their First Amendment right to the free exercise of religion, and their Fourteenth Amendment right to the due process of law. Defendant City's failure to train and supervise its officers, agents, and employees violated Plaintiffs' Fourteenth Amendment right to the due process of law. In their Motion for Summary Judgment (the "Motion"), Plaintiffs argue that there are no genuine issues of material fact, and that they are entitled to judgment as a matter of law.

## ARGUMENT

### I. SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. A fact is material when it might affect the outcome of the suit under the governing law. A genuine dispute arises when the evidence is such that a reasonable jury could return a verdict for the non-moving party.

*Strothers v. City of Laurel, Md.*, 895 F.3d 317, 326 (4th Cir. 2018) (internal citations and quotation marks omitted). "[A]t the summary judgment phase, the pertinent inquiry is whether there are any genuine factual issues that properly can be resolved only by a finder of fact because

they may reasonably be resolved in favor of either party." *Variety Stores, Inc. v. Wal-Mart Stores, Inc.*, 888 F.3d 651, 659 (4th Cir. 2018) (internal citation, quotation marks, and alterations omitted).

Once a motion for summary judgment is made,

the burden is on the nonmoving party to show that there is a genuine issue of material fact for trial by offering sufficient proof in the form of admissible evidence. Summary judgment cannot be granted merely because the court believes that the movant will prevail if the action is tried on the merits. Therefore, courts must view the evidence in the light most favorable to the nonmoving party and refrain from weighing the evidence or making credibility determinations. A court improperly weighs the evidence by failing to credit evidence that contradicts some of its key factual conclusions, or by failing to draw reasonable inferences in the light most favorable to the nonmoving party.

*Id.* (internal citation, quotation marks, and alterations omitted).

## II. THE CODE, ON ITS FACE, VIOLATES THE FREE SPEECH AND FREE EXERCISE CLAUSES OF THE FIRST AMENDMENT

The Code states in part:

66-81 Picket or picketing means to make a public display or demonstration of sentiment for or against a person or cause, including protesting which may include the distribution of leaflets or handbills, the display of signs and any oral communication or speech, which may involve an effort to persuade or influence, including all expressive and symbolic conduct, whether active or passive.

. . .

66-84(a) Picketing may be conducted on public sidewalks, in any city-controlled park, or in other city-owned areas normally used or reserved for pedestrian movement, including easements and rights-of-way, and shall not be conducted on the portion of the public roadway used primarily for vehicular traffic.;

66-84(b) Notwithstanding subsection (a), picketing may not be conducted:

(1) On any city-controlled park during a festival that has been permitted at that particular property or when that property has been otherwise reserved for private use;

. . .

4

66-84(d) Written or printed placards or signs, flags, or banners carried by individuals engaged in picketing shall be of such a size and/or carried on the sidewalks or other city-owned areas, as to allow safe and unobstructed passage of pedestrian or vehicular traffic. The staff or pole on which a sign, flag, or banner may be carried shall be made of corrugated material, plastic, or wood, and shall not exceed 40 inches in length and shall not be made of metal or metal alloy. If made of wood, the staff or pole shall be no greater than threefourths inch in diameter at any point. A staff or pole must be blunt at both ends.

In multiple respects, the Code is unconstitutionally overbroad. Under the Supreme Court's overbreadth doctrine, "a statute is facially invalid if it prohibits a substantial amount of protected speech." *U.S. v. Williams*, 553 U.S. 285, 292 (2008). The Court has held that "the threat of enforcement of an overbroad law deters people from engaging in constitutionally protected speech, inhibiting the free exchange of ideas." *Id.* When addressing First Amendment rights in the context of a statute challenged for overbreadth, the Supreme Court has held that it "insist[s] on statutes 'narrowly drawn to prevent the supposed evil.'" *Younger v. Harris*, 401 U.S. 37, 59 (1971) (quoting *Cantwell v. Conn.*, 310 U.S. 296, 307 (1940)). Here, the Code "prohibits a substantial amount of protected speech," *Williams*, 553 U.S. at 292; "the threat of enforcement of [the Code] deters people from engaging in constitutionally protected speech, inhibiting the free exchange of ideas," *id.*; and the Code is not "narrowly drawn to prevent the supposed evil." *Younger*, 401 U.S. at 59.

In addressing Plaintiffs' facial challenge based on overbreadth, this Court's "'first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct.'" *City of Houston, Tex. v. Hill*, 482 U.S. 451, 458 (1987) (quoting *Hoffman Estates v. The Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494 (1982)). The Supreme Court has held that courts must apply a three-pronged analysis for evaluating free speech cases: (1) determine if the speech in question is protected under the First Amendment; (2) identify the nature of the forum in which the speech would take place; and (3) assess whether the government's exclusion of the

5

speech from the forum is justified by the requisite standard. *Cornelius v. NAACP Legal Defense and Educ. Fund*, 473 U.S. 788, 797 (1985).

### A.    The Code, on its Face, Covers Protected Speech

On its face, the Code defines "picketing" to include "a public display or demonstration of sentiment for or against a person or cause . . . ." Sec. 66-81. Such "display" or "demonstration" includes "the distribution of leaflets or handbills, the display of signs and any oral communication or speech, which may involve an effort to persuade or influence, including all expressive and symbolic conduct, whether active or passive." *Id.*

This definition clearly covers speech protected by the First Amendment. First, the oral communication Plaintiffs engaged in constitutes classic free speech. *Edwards v. South Carolina*, 372 U.S. 229, 233 (1963). Second, "leaf-letting [is] an expressive activity involving 'speech' protected by the First Amendment." *U.S. v. Grace*, 461 U.S. 171, 176 (1983). Pamphleteering is a particularly inoffensive means of communication: "one need not ponder the contents of a leaflet or pamphlet in order to mechanically take it out of someone's hand." *U.S. v. Kokinda*, 497 U.S. 720, 734 (1990) (plurality opinion). Finally, the Supreme Court has recognized that the First Amendment protects the display of signs as a form of expression. *See City of Ladue v. Gilleo*, 512 U.S. 43, 48 (1994). Signs portraying noncommercial speech (such as picket signs) receive higher First Amendment protection than commercial speech. *See Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 506-07 (1981); *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n*, 447 U.S. 557, 562-63 (1980); *Matthews v. Town of Needham*, 596 F. Supp. 932, 934 (D. Mass. 1984). In *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2226 (2015), the Supreme Court struck down a city's sign code that regulated signs based on their content. Section 66-84(d) imposes restrictions on placards, signs, flags, and banners, including the permitted height,

6

material from which the staff or pole may be constructed, and, should the staff or pole be made of wood, the permitted diameter thereof. These restrictions, like those of 66-84(a) and 66-84(b), "reach[] a substantial amount of constitutionally protected conduct." *Hill*, 482 U.S. at 458.

The Supreme Court has held time and again that religious speech is free speech and those engaging in collective free speech are entitled to the fullest protection the First Amendment affords.

> Our precedent establishes that private religious speech, far from being a First Amendment orphan, is as fully protected under the Free Speech Clause as secular private expression. Indeed, in Anglo-American history, at least, government suppression of speech has so commonly been directed precisely at religious speech that a free-speech clause without religion would be Hamlet without the prince.

*Capitol Square Review and Advisory Board v. Pinette*, 515 U.S. 753, 760 (1995); *see also Martin v. City of Struthers*, 319 U.S.141, 149 (1943) (Murphy, J., concurring) ("nothing enjoys a higher estate in our society than the right given by the First and Fourteenth Amendments freely to practice and proclaim one's religious convictions").

Under the Code, the mere handing of Gospel tracts to those willing to receive them is deemed "picketing," as is silently holding a sign or cross. "[O]ral communication or speech, which may involve an effort to persuade or influence," includes answering questions about religion posed by members of the public, or having a peaceful discussion of religion. As defined by the Code, picketing would also include a festival patron attempting to "persuade" or "influence" another festival patron on any number of topics including political, religious and/or social issues. The Code clearly covers protected speech.

### B. The Code Applies in Traditional Public Fora

Picketing, as defined by the Code, is prohibited by § 66-84(b) "[o]n any city-controlled park during a festival that has been permitted at that particular property or when that property has

been otherwise reserved for private use." This subsection covers MumFest, or at least portions thereof. Further, § 66-84(a) prohibits picketing "on the portion of the public roadway used primarily for vehicular traffic." On its face, this provision does not distinguish between roadways that are open to traffic or closed to traffic, as they are during MumFest. Indeed, it is the City's position that this subsection applies whether the roadway is closed or not. (Statement at ¶ 90). Record evidence clearly establishes that in both 2015 and 2017 MumFest took place, at least in part, on public roads that were closed to traffic. Video evidence depicts a performer performing in the middle of a roadway, and the attendant crowd gathered in that same roadway. (Statement at ¶ 91). Yet, per § 66-84(a), no "[o]ral communication or speech, which may involve an effort to persuade or influence," may occur on that same roadway.

City-controlled parks and the public roads on which MumFest was conducted, and which are covered by the Code, are traditional public fora. First Amendment precedent contemplates three types of government property – or fora – in which speech occurs: (1) traditional, (2) designated or limited, and (3) non-public. *See Cornelius*, 473 U.S. at 802. It is well settled that public streets, public sidewalks, public squares, public parks, public grounds, and other public rights-of-way are the "quintessential" public fora. *See Frisby v. Schultz*, 487 U.S. 474, 481 (1988). The First Amendment guarantees the utmost protection in traditional public fora.

> Wherever the title of streets and parks may rest, they have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions. Such use of the streets and public places has, from ancient times, been a part of the privileges, immunities, rights, and liberties of citizens.

*Hague v. C.I.O.*, 307 U.S. 496, 515 (1939). The Supreme Court has been consistently clear that traditional public fora occupy "a special position in terms of First Amendment protection" and

"the government's ability to restrict expressive activities [in them] is very limited.'" *Boos v. Barry*, 485 U.S. 312, 318 (1988) (quoting *Grace*, 461 U.S. at 180).

Contrary to the provisions of the Code, the City is not authorized to transform public parks or public streets from a traditional public forum into anything else. Traditional public fora "are open for expressive activity regardless of the government's intent." *Ark. Educ. Television Comm'n v. Forbes*, 523 U.S. 666, 678 (1998). Traditional public fora, like public parks and public roads, cannot be transformed into non-public fora by government whim. "Congress, no more than a suburban township, may not by its own *ipse dixit* destroy the 'public forum' status of streets and parks which have historically been public forums . . . ." *United States Postal Service v. Council of Greenberg Civic Ass'n*, 453 U. S. 114, 133 (1981). *See also Grace*, 461 U.S. at 175 (government may not "transform the character of the property by the expedient of including it within the statutory definition of what might be considered a non-public forum parcel of property").

In *O'Connell v. Town of Burgaw, et al.*, Case No. 7:17-CV-65-D (E.D.N.C. June 13, 2017) (a true and correct copy of the Order is attached hereto as **Exhibit A**), this Court addressed a similar case involving one of the Plaintiffs in the instant case. This Court entered a preliminary injunction in favor of O'Connell, holding:

> On its face, the Code purports to redefine the grounds of the Pender County Courthouse Square and the sidewalks and streets located within the immediate area of the Pender County Courthouse Square as exempt from the First Amendment from 7:00 a.m. on the day before the commencement of the festival until 7:00 p.m. on the day after the commencement of the festival by virtue of the Code's creation of an 'alternate public forum' on the western portion of the block located between West Bridgers Street and West Wilmington Street and immediately adjacent to North Dudley Street. *See* [D.E. 21-2]. The Town, however, cannot 'by its own *ipse dixit* destroy the "public forum" status of the streets and parks which have historically been public forums.' *U.S. Postal Serv. v. Council of Greenburgh Civic Ass'ns.*, 453 U.S. 114, 133 (1981); *see Forbes*, 523 U.S. at 678; *Grace*, 461 U.S. at 175.

9

*Id.* at 5.

Thus, the City may not decide that a public park or a public street is a public forum so long as there is no festival being held there, but when a festival is being held, it is no longer a public forum, and prohibit citizens from exercising their constitutional rights therein.

**C.    The Code, on its Face, Fails Constitutional Scrutiny**

As noted above, in public fora, "the government's ability to permissibly restrict expressive conduct is very limited." *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971) (citations omitted); *see also Gaudrya Vaishrava Soc'y v. City and County of San Francisco*, 952 F.2d 1059, 1065 (9th Cir. 1991) (within "traditional public fora, the government's authority to restrict speech is at its minimum"); *Int'l Soc. for Krishna Consciousness, Inc. v. Lee*, 505 U.S. 672 (1992) ("regulation of speech on government property that has traditionally been available for public expression is subject to the highest scrutiny"). Once it is determined that the speech is protected and that the speech is being conducted in traditional public fora, then the powers of governing authorities to "limit expressive activities are sharply circumscribed." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983).

"It is not enough that the goals of the law be legitimate, or reasonable, or even praiseworthy. There must be some pressing public necessity, some essential value that has to be preserved; and even then the law must restrict as little speech as possible to serve that goal." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 680 (1994) (O'CONNOR, J., concurring in part and dissenting in part). Moreover, the government defendant (the City) bears the burden of demonstrating that its enactment meets constitutional requirements. *See Davenport v. City of*

10

*Alexandria*, 710 F.2d 148, 152 n.8 (4th Cir. 1983) ("a governmental entity must always be prepared to come forward with a strong factual justification for its actions"). In the realm of First Amendment rights, the presumption of constitutionality usually accorded legislative decisions does not apply. *See Hickory Fire Fighters Ass'n v. City of Hickory, N.C.*, 656 F.2d 917, 923 (4th Cir. 1981); *Blasecki v. City of Durham, N.C.*, 456 F.2d 87, 91 (4th Cir.), *cert. denied*, 409 U.S. 912 (1972).

### 1. The Code, on its Face, Grants Unbridled Discretion to Law Enforcement

The Court in *American Jewish Congress v. City of Beverly Hills*, 90 F.3d 379, 385 (9th Cir. 1996) (*en banc*), held:

> [A] law or policy permitting communication in a certain manner for some but not for others raises the specter of content and viewpoint censorship. This danger is at its zenith when the determination of who may speak and who may not is left to the unbridled discretion of a government official. . . . [W]e have often and uniformly held that such statutes or policies impose censorship on the public or the press, and hence are unconstitutional, because without standards governing the exercise of discretion, a government official may decide who may speak and who may not based upon the content of the speech or viewpoint of the speaker.

(citing *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 763-64 (1988)).

The Code gives law enforcement unbridled discretion to determine who may speak and who may not, as demonstrated by Defendants' enforcement of the Code at MumFest. Plaintiffs were not allowed to bring a cross into the festival area, while other individuals were allowed to walk around with five-foot tall windmills. (Statement at ¶ 13). Further, Conway stated that, if two opposing groups in a public place want to talk to each other, the City's police officers have the authority to make them move apart, including across the street. (Statement at ¶ 37). According to Conway, in addressing groups advocating opposing positions, the police have the right to preempt "issues." (Statement at ¶ 38). This means law enforcement may interfere with

11

protected speech before any "issue" has arisen. Conway stated that all law enforcement officers, by virtue of being law enforcement officers, have the discretion to make people move when such people are advocating positions in a public place. (Statement at ¶ 39).

Because law enforcement officers have discretion, some could enforce the MumFest prohibition on literature distribution, and some might not – it depends upon the individual officer. (Statement at ¶ 45). According to Conway, Swiss Bear has control over the MumFest festival area by virtue of their permit, and has the authority to determine if someone is allowed to stay or be removed. (Statement at ¶ 46). According to Conway, because the MumFest festival area belongs to Swiss Bear, they can ask law enforcement to trespass someone for violating a festival rule, even if there is no violation of a City ordinance. (Statement at ¶ 47). According to Conway, if someone is told to leave and refuses, that is grounds for arrest. (Statement at ¶ 48). According to Conway, a law enforcement officer has the discretion to apply the law differently than other officers. (Statement at ¶ 49).

If someone at MumFest, by speaking or otherwise, interferes with a paid vendor or causes them to lose business, law enforcement will make the person move. (Statement at ¶ 50). According to Conway, a vendor who has paid for a specific location at MumFest has a greater right to be there than a member of the public. (Statement at ¶ 51). According to Conway, a MumFest vendor has the discretion to determine whether someone is interfering. (Statement at ¶ 52). At MumFest, a law enforcement officer will make someone move based upon the word of a vendor that the person is interfering with their business. If the person refuses, they can be trespassed and arrested. (Statement at ¶ 53). According to Conway, a vendor has the same authority over his area as Swiss Bear has over the festival area. (Statement at ¶ 54).

According to Conway, it would be up to Swiss Bear to determine whether two people exchanging telephone numbers violated a MumFest festival rule. (Statement at ¶ 62). That means, if Swiss Bear determined that exchanging telephone numbers violated a festival rule, law enforcement would remove those people from the festival. In 2015, a vendor, a member of the GOP, was distributing literature outside his vendor booth, and Conway told him he had to be in his booth, by festival rule, and that if he refused, he could be asked to leave, and then would be trespassing. (Statement at ¶ 63). In 2015 Conway told O'Connell, Crowley, and their group to move because they were interfering with a paid vendor, and people were getting upset with them. (Statement at ¶ 64). According to Conway, when people are yelling at a speaker, they are starting to get hostile, and that is grounds to make the speaker move. (Statement at ¶ 65). This is despite the fact that there was no violence or threat of violence in response to Plaintiffs' speech at MumFest in 2015. (Statement at ¶ 66).

According to the City, law enforcement has the discretion to preempt violence as opposed to waiting until violence is imminent. (Statement at ¶ 78). According to the City, vendor areas are reserved for private use. Vendors enter into a contract or agreement for that. According to the City, protesters may not conflict with vendors' free commerce. (Statement at ¶ 84). According to the City, officers have discretion to enforce rules outside of the Code. (Statement at ¶ 85).

All of the above constitutes unbridled discretion allowing censorship of freedom of speech which results from the fact that the Code, as written, provides no minimum guidelines to govern law enforcement. Under well-established Supreme Court precedent, this discretion is unconstitutional.

13

### 2. The Code is not a Reasonable Time, Place, and Manner Restriction

Short of total exclusion of the speaker, the government may impose reasonable time, place, and manner restrictions on speech in traditional public fora. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). In order for a time, place, and manner restriction on expressive activity in a traditional public forum to pass constitutional muster, the restriction must: (1) be content-neutral; (2) serve a significant governmental interest; (3) be narrowly tailored to serve that interest; and (4) leave open ample alternative channels of communication. *See Grace*, 461 U.S. at 177. In this case the Code excludes, during festivals, all "picketing" which, as discussed above, is broadly-defined in the Code to cover protected free speech.

### a. The Code Does Not Serve a Significant Government Interest

The Code does not serve a significant government interest. The fear of disturbance during festivals cannot justify the infringement of First Amendment rights. The Supreme Court recognized long ago:

> [U]ndifferentiated fear or apprehension of disturbance is not enough to overcome the right to freedom of expression. Any departure from absolute regimentation may cause trouble. Any variation from the majority's opinion may inspire fear. Any word spoken . . . that deviates from the views of another person may start an argument or cause a disturbance. But our Constitution says we must take this risk, *Terminiello v. Chicago*, 337 U.S. 1 (1949); and our history says that it is this sort of hazardous freedom – this kind of openness – that is the basis of our national strength and of the independence and vigor of Americans who grow up and live in this relatively permissive, often disputatious, society.

*Tinker v. Des Moines Ind. Community Sch. Dist.*, 393 U.S. 503, 508-509 (1969). It is also noteworthy that whatever interest the City believes it is serving exists only when festivals are taking place in the City. It is unclear, and unjustified, that the interest of the City in conducting festivals without people exercising free speech rights is a significant government interest justifying the restriction of constitutional rights.

14

### b.    The Code is not Narrowly Tailored

Even if the City's interest were to be deemed significant, the Code's restrictions on First Amendment rights are not narrowly tailored to serve any such interest. In order for a time, place, and manner restriction to be narrowly tailored, it must not "burden substantially more speech than is necessary to further the government's legitimate interests." *Ward*, 491 U.S. at 799. Here, the Code simply bans, during festivals, the distribution of literature to those willing to receive it, the silent holding of a sign or cross, and "[o]ral communication or speech, which may involve an effort to persuade or influence." These restrictions burden far more speech than necessary to further any government interest, even if there were one.

In *McCullen v. Coakley*, 134 S. Ct. 2518, 2535-2541 (2014), the Supreme Court held that a statute that created buffer zones around abortion clinics which "protesters" were not permitted to penetrate burdened substantially more speech than necessary. The Court identified several less burdensome options the Commonwealth of Massachusetts could have taken to address its interest. The Court noted that the Commonwealth could have enacted a law similar to the federal Freedom of Access to Clinic Entrances Act, which used more specific measures to ensure safety and prevent harassment, intimidation, and obstruction around abortion clinics. *Id.* at 2537. The Court held that, to prevent harassment, the Commonwealth could enact legislation that criminalized following and harassing anyone within 15 feet of a clinic. *Id.* at 2538. While the Commonwealth raised a concern about the safety risk created when protestors obstructed driveways leading to clinics, the Court noted that the situation could have been addressed by existing ordinances. *Id.* In short, the Court held that the Commonwealth had "available to it a variety of approaches that appear capable of serving its interests, without excluding individuals from areas historically open for speech and debate." *Id.* at 2539.

15

The fact that a government's chosen restriction is "easier" to enforce than alternatives does not satisfy the Constitution. The *McCullen* Court held that "[t]o meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier. A painted line on the sidewalk is easy to enforce, but the prime objective of the First Amendment is not efficiency." *Id.* at 2540. The Court concluded that the Commonwealth had pursued its interests "by the extreme step of closing a substantial portion of a traditional public forum to all speakers. It has done so without seriously addressing the problem through alternatives that leave the forum open for its time-honored purposes. The Commonwealth may not do that consistent with the First Amendment." *Id.* at 2541.

This Court held in *O'Connell*:

> To qualify as a constitutional time, place, and manner restriction, the Code must be narrowly tailored to serve a significant governmental interest. *See, e.g., Grace*, 461 U.S. at 177. The court assumes without deciding that the Town has a significant governmental interest in ensuring smooth pedestrian traffic flow, public safety, and relieving congestion and overcrowding during festivals, including the Blueberry Festival. *See, Heffron* [*v. Int'l Soc'y for Krishna Consciousness, Inc.*], 452 U.S. [640,] 649-50 [(1981)]. However, the Code is not narrowly tailored to further those interests. To be narrowly tailored, a restriction on speech must not 'burden substantially more speech than is necessary to further the government's legitimate interests.' *Ward v. Rock Against Racism*, 491 U.S. 781, 799 (1989). Although a regulation 'may satisfy the tailoring requirement even though it is not the least restrictive or least in1rusive means of serving the [state's] goal,' *Hill v. Colorado*, 530 U.S. 703, 726 (2000), the requirement must not be 'substantially broader than necessary.' *Ward*, 491 U.S. at 800.

*O'Connell*, Case No. 7:17-CV-65-D at 4.

Similar to the situation addressed by the Supreme Court in *McCullen*, the Code burdens substantially more speech than necessary. The City should have followed the Court's lead in *McCullen* by addressing its interests with more specific legislation. If the City is concerned about festival-goers being harassed or intimidated, it could enact an ordinance that prohibits such

16

activity (or enforce existing ordinances that may do so). If the City sees a need to reduce or prevent people from obstructing or impeding access to the festival grounds, again, it may enact an ordinance that addresses that need. The City cannot, as the Code does, allow for a complete ban of all literature distribution, the display of any placard, sign, flag, banner, or cross, and "any oral communication or speech, which may involve an effort to persuade or influence" any time a festival is in town.

### c.   The Code Does Not Leave Open Ample Alternative Channels of Communication

Further, the Code does not leave open ample alternative channels of communication. The Commonwealth in *McCullen* attempted to justify its buffer zones by arguing that protestors could still protest outside the buffer zones. The Supreme Court was not persuaded, noting that the plaintiffs gave evidence that their conversations with women outside the clinics "have been far less frequent and far less successful since the buffer zones were instituted." 134 S. Ct. at 2436-37. A specific place where a message is communicated may be just as important as the message itself. *See City of Ladue*, 512 U.S. at 56. Thus, "a location across the street is not an ample alternative channel of communication when [a person] could have been standing in the park." *World Wide Street Preachers' Fellowship v. Reed*, 430 F. Supp. 2d 411, 415 (M.D. Pa. 2006). In other words, "one is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place." *Schneider v. State of New Jersey*, 308 U.S. 147, 163 (1939).

This Court held in *O'Connell*:

Likewise, on its face, the Code improperly prohibits plaintiff from mingling with other people located on the grounds of the Pender County Courthouse Square and sidewalks and streets located within the immediate area of the Pender County Courthouse Square to discuss politics, religion, sports, or anything else. *Cf. Heffron*, 452 U.S. at 643-44 (upholding a state fair rule requiring all persons,

17

groups, or firms who desire to sell, exhibit, or distribute materials during the fair to do so from fixed locations on the fairgrounds, but not preventing people from "walking about the fairgrounds and communicating the organization's views with fair patrons in face-to-face discussions' or displaying signs); *Price v. City of Fayetteville*, No. 5:13-CV-150-FL, 2013 WL 1751391, at *2-9 (E.D.N.C. Apr. 23, 2013) (unpublished) (upholding a rule confining distribution of all flyers, pamphlets, coupons, or any other printed material during a downtown three-day festival to designated areas). The Code also improperly prohibits plaintiff from handbilling, carrying a sign, or conveying a message on his shirt or his hat. The Code's total ban on such speech is not necessary and is substantially broader than necessary to achieve the Town's purported interests in adopting the Code.

*O'Connell*, Case No. 7:17-CV-65-D at 5.

Here, pursuant to the Code, Plaintiffs were not allowed to enter the MumFest festival area with a cross, were prohibited from distributing literature inside the festival, and were not allowed to preach inside the festival. In fact the Code, on its face, prohibits all "picketing" in a public park or public road when a festival is being conducted there. Thus, Plaintiffs were given no alternative channel of communication except to leave the festival area. Leaving the festival removed Plaintiffs from their target audience, and largely defeated the purpose of them coming to the festival. (Statement at ¶¶ 86-87). Even outside the festival, Plaintiffs had to move to accommodate a street performer simply because he had paid to be a vendor. The Code simply provides no reasonable alternative channel of communication.

### 3. The Overbreadth Doctrine Protects the Rights of Citizens Not Before the Court

The overbreadth doctrine explicitly protects individuals who may not be before the Court.

Under the First Amendment overbreadth doctrine, an individual whose own speech or conduct may be prohibited is permitted to challenge a statute on its face 'because it also threatens others not before the court—those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid.'

*Bd. of Airport Comm'rs of the City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987) (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 503 (1985)). Said differently,

"[t]he Court consistently has permitted 'attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity.'" *Bigelow v. Va.*, 421 U.S. 809, 815-16 (1975) (quoting *Dombrowski v. Pfister*, 380 U.S. 479, 486 (1965)). Thus, Plaintiffs may challenge the Code as overbroad.

Prohibiting citizens from exercising First Amendment freedoms in the City's public parks and streets whenever there happens to be a festival in that space, as provided by the Code, does not survive constitutional scrutiny and is not narrowly tailored. On the other hand, it clearly damages Plaintiffs', and anyone else's, ability to engage in constitutionally-protected activities, as it severely limits, if not eliminates, their ability to be heard at all. Thus, based on clear and long-standing Supreme Court precedent, the Code is unconstitutional on its face. Because this is a conclusion of law, Plaintiffs are entitled to judgment as a matter of law on their facial challenge to the Code.

## III.   THE CODE ON ITS FACE VIOLATES THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT

The Supreme Court has consistently ruled that any law is unconstitutional which allows discretion in enforcement. *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (holding all laws must provide "minimum guidelines to govern law enforcement" to prevent the possibility of discretionary enforcement). Addressing the void-for-vagueness doctrine, the Supreme Court held: "A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Williams*, 553 U.S. at 304. As discussed at length above, the Code provides unbridled discretion to law enforcement to determine who may and who may not speak. Further exacerbating the violation is

law enforcement's delegation of discretion to Swiss Bear and individual vendors to determine who may and who may not speak.

This unbridled discretion threatens not just Plaintiffs, but any citizen who wishes to exercise their constitutional rights during a festival in the City.

> Although ordinarily '[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others,' we have relaxed that requirement in the First Amendment context, permitting plaintiffs to argue that a statute is overbroad because it is unclear whether it regulates a substantial amount of protected speech.

*Williams*, 553 U.S. at 304 (quoting *Hoffman Estates*, 455 U.S. at 494–495, and nn. 6 and 7. The Code, on its face, violates the Due Process Clause of the Fourteenth Amendment.

## IV. THE CODE IS UNCONSTITUTIONAL AS APPLIED

### A. The Code, as Applied, Violates the Free Speech and Free Exercise Clauses of the First Amendment

As discussed above, Plaintiffs' speech, prohibited by Defendants at MumFest, is protected speech, and was exercised in a traditional public forum. Defendants' interpretation and application of the Code fails constitutional scrutiny. In applying the Code to Plaintiffs, in 2015, several officers approached O'Connell, Crowley, and their group when they arrived at MumFest, and told them that they could not bring the cross into the festival. Conway banned O'Connell from entering the MumFest festival unless O'Connell agreed to leave his cross outside the festival area. Officers physically blocked O'Connell from entering the festival with his cross. (Statement at ¶ 9). In 2015, Conway instructed two firefighters to park their utility vehicle in front of O'Connell, Crowley, and their group and directed them to place the cart in reverse so that the "beep" warning would drown them out. Conway and the firefighters then laughed together while the constant "beep" sound emanated from the cart. Later in the day, Conway

returned with another utility cart that he was driving and engaged in the same activity to cause the constant "beep" with his cart. (Statement at ¶ 11).

In 2015, some of O'Connell's associates went inside the MumFest festival area to preach bare-voiced and distribute literature, and the police removed and banned them from the event. (Statement at ¶ 58). When one of O'Connell's and Crowley's associates asked why he had to move from the MumFest festival area, the officer replied "because I said so," and "because you're disturbing the peace." (Statement at ¶ 59). In 2015, Crowley went into the MumFest festival area, and Conway told him he could not distribute any literature. Crowley had to go outside the festival area to distribute literature, and there was almost no one there. (Statement at ¶ 60). When Crowley was told he could not distribute literature, there was no violence or threat of violence in the vicinity, no physical altercation, and no complaints that they were blocking the road or the sidewalk where they were standing. (Statement at ¶ 61).

Conway told O'Connell, Crowley, and their group to move from a location outside the MumFest festival area because they were interfering with a paid vendor, and people were getting upset with them. Conway justified this removal by noting that, when Plaintiffs and their group moved to an adjacent sidewalk, people cheered. (Statement at ¶ 64). According to Conway, when people are yelling at a speaker, they are starting to get hostile, which is grounds to make the speaker move. (Statement at ¶ 65). Yet, there was no violence or threat of violence in response to Plaintiffs' speech at MumFest in 2015. (Statement at ¶ 66). In *Bible Believers v. Wayne County*, 805 F.3d 228, 252 (6th Cir. 2015), the Court held:

> In a balance between two important interests—free speech on one hand, and the state's power to maintain the peace on the other—the scale is heavily weighted in favor of the First Amendment. *See, e.g., Terminiello*, 337 U.S. at 4, 69 S. Ct. 894. Maintenance of the peace should not be achieved at the expense of the free speech. The freedom to espouse sincerely held religious, political, or philosophical beliefs, especially in the face of hostile opposition, is too important to our democratic institution for it to be abridged simply due

21

to the hostility of reactionary listeners who may be offended by a speaker's message. If the mere possibility of violence were allowed to dictate whether our views, when spoken aloud, are safeguarded by the Constitution, surely the myriad views that animate our discourse would be reduced to the 'standardization of ideas . . . by . . . [the] dominant political or community groups. *Id*. at 4-5, 69 S. Ct. 894. Democracy cannot survive such a deplorable result.

In 2015, Conway justified separating Plaintiffs and their group from the rest of the public because some of the young people that were there had been at MumFest in previous years, and had verbally confronted O'Connell and his group. (Statement at ¶ 67). In previous years, those individuals would yell back and forth at O'Connell's group, they would taunt O'Connell's group by kissing in front of him, but they never engaged in violence. (Statement at ¶ 68). In 2015, one woman kept facing O'Connell and his group and fanning out her rainbow flag at them. This caused Conway to separate O'Connell and his group from the public in order to, as he said, make sure no violence was precipitated. (Statement at ¶ 69). When a man crossed his arms and made a smart comment to O'Connell, Conway considered that to be an act of aggression. (Statement at ¶ 71). However, Conway does not know of anyone complaining about O'Connell and his group making physical contact with anyone or blocking ingress or egress. (Statement at ¶ 70). Clearly, while some individuals clearly disagreed with O'Connell's and Crowley's message, none of the actions cited above come close to constituting imminent violence and thus, by the City's own standard, are not grounds to restrict Plaintiffs' protected speech. (Statement at ¶ 89).

In 2017, O'Connell came to preach at MumFest, and was able to get to the traffic circle. He began to preach and was approached by Officer Wilson. Wilson told him he had to take the cross out of the festival area. (Statement at ¶ 74). Sergeant Sneedon told O'Connell that he did not need to remove his cross, but that it had to remain collapsed. (Statement at ¶ 75). O'Connell kept his cross collapsed during the entire time he preached, in order to avoid arrest. (Statement at

¶ 76). The cross is an important part of O'Connell's message, and without it, the message is diminished. When the cross is collapsed, it is not a part of the message. (Statement at ¶ 77).

In this way, Defendants' enforcement of the Code against Plaintiffs in 2015 and 2017 violated their First Amendment free speech and free exercise rights.

### 1. Defendants' Application of the Code Did Not Constitute a Reasonable Time, Place, and Manner Restriction.

As set forth above, the City has no significant government interest in prohibiting all forms of speech identified by the Code as "picketing," including literature distribution, carrying placards, signs, flags, banners, and crosses, and oral communication, any time a festival is in town. This is especially so since the City and its officers simply permit Swiss Bear and individual vendors, who are private entities and individuals, to determine, in their sole discretion, what speech is allowed and what is not. Defendants' prohibition of Plaintiffs' speech, by excluding their cross, excluding all literature distribution and, in 2015, excluding all bare-voiced preaching inside the festival, is not narrowly-tailored to serve any government interest, significant or otherwise. And, as set forth above, Defendants' application of the Code provided no alternative channel of communication for Plaintiffs to reach their target audience. Accordingly, the Code, as applied by Defendants, violated Plaintiffs' First Amendment rights.

### 2. Defendants Enforced an Unconstitutional Heckler's Veto

Defendants' justification of the prohibition of Plaintiffs' speech by appealing to the will of the surrounding crowd constitutes a heckler's veto. The Supreme Court has affirmed the principle that "constitutional rights may not be denied simply because of hostility to their assertion or exercise." *Watson v. City of Memphis*, 373 U.S. 526, 535 (1963). *See also Cantwell v. Connecticut*, 310 U.S. 296 (1940); *Terminiello v. City of Chicago*, 337 U.S. 1 (1949); *Edwards v. South Carolina*, 372 U.S. 229 (1963); *Cox v. Louisiana*, 379 U.S. 536 (1965); and *Gregory v.*

*City of Chicago*, 394 U.S. 111 (1969). Constitutionally-protected speech "does not lose its protection under the First Amendment due to the lawless reaction of those who hear it. Simply stated, the First Amendment does not permit a heckler's veto."

> When a peaceful speaker, whose message is constitutionally protected, is confronted by a hostile crowd, the state may not silence the speaker as an expedient alternative to containing or snuffing out the lawless behavior of the rioting individuals. *See Watson*, 373 U.S. at 535-36, 83 S. Ct. 1314. Nor can an officer sit idly on the sidelines—watching as the crowd imposes, through violence, a tyrannical majoritarian rule—only later to claim that the speaker's removal was necessary for his or her own protection.

*Bible Believers*, 805 F.3d at 252-53. The Supreme Court held long ago that speech cannot be proscribed because it "stirred people to anger, invited public dispute, or brought about a condition of unrest." *Terminiello*, 337 U.S. at 5. "[U]ncontrolled official suppression of the privilege [of free speech] cannot be made a substitute for the duty to maintain order in connection with the exercise of th[at] right." *Hague*, 307 U.S. at 516. If a speaker is threatened with violence, the police must protect the speaker, not simply remove him from the threat, thereby violating his constitutional rights. By restricting Plaintiffs' protected speech to satisfy "upset" members of the crowd, who "cheered" when Plaintiffs were moved, Defendants enforced an unconstitutional heckler's veto.

**B.      The Code, as Applied, Violates the Due Process Clause of the Fourteenth Amendment**

As discussed at length above, the Code grants unbridled discretion to law enforcement in applying the Code against Plaintiffs, in violation of their First Amendment rights. Defendants' unconstitutional conduct, also discussed above, was pursuant to the exercise of this unbridled discretion. This exercise of unbridled discretion violated Plaintiffs' Fourteenth Amendment Due Process rights. In addition, Conway's and the other officers' conduct clearly demonstrates the City's failure to train, in violation of the Due Process Clause.

24

The City approved of its officers' handling of the situation with Plaintiffs. (Statement at ¶ 73). Most of the time law enforcement is made aware of MumFest festival rules "on the fly," such as by giving law enforcement specific rules during briefings. (Statement at ¶ 41). If the person in charge of MumFest approaches law enforcement during the festival and tells them that someone is doing something that Swiss Bear does not allow, law enforcement takes their word for it. (Statement at ¶ 42). If a festival-goer is distributing literature, Conway will tell them to stop because it is a festival rule, even though he believes it is not against the law. (Statement at ¶ 43). As discussed at length above, the City's law enforcement officers have unbridled discretion to restrict First Amendment rights during festivals, and exercised that discretion in the instant case against Plaintiffs.

These statements of the discretion exercised by law enforcement in the City clearly demonstrate a lack of proper training. Law enforcement believe that each officer has the discretion to apply the law differently than other officers; to act at the behest of Swiss Bear and/or Mumfest vendors, even if their requests violate City ordinances; to take Swiss Bear's word as to what their rules are; to grant Swiss Bear and individual vendors proprietary control over public property; to force speakers to move if they interfere with a vendor's business, regardless of the speaker's First Amendment rights; and to restrict First Amendment rights to "preempt" violence even when no violence is imminent. The City's woeful failure to train its law enforcement officers on First Amendment rights constitutes a violation of Plaintiff's Fourteenth Amendment Due Process rights.

In *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989), the Supreme Court held that the inadequacy of police training as a basis for § 1983 liability requires a finding of "deliberate indifference to the rights of persons with whom the police come into contact." The Court

addressed a claim that "if a concededly valid policy is unconstitutionally applied by a municipal employee, the city is liable if the employee has not been adequately trained and the constitutional wrong has been caused by that failure to train." *Id.* at 387. The Court concluded, "as have all the Courts of Appeals that have addressed this issue, that there are limited circumstances in which an allegation of a 'failure to train' can be the basis for liability under § 1983." *Id.* (internal footnote omitted). The Court held further:

> it may happen that, in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*Id.* at 390 (internal footnotes omitted).

Further, the Supreme Court has held:

> . . . it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances. No one has ever doubted, for instance, that a municipality may be liable under § 1983 for a single decision by its properly constituted legislative body — whether or not that body had taken similar action in the past or intended to do so in the future — because even a single decision by such a body unquestionably constitutes an act of official government policy. *See, e. g., Owen v. City of Independence*, 445 U. S. 622 (1980) (City Council passed resolution firing plaintiff without a pretermination hearing); *Newport v. Fact Concerts, Inc.*, 453 U. S. 247 (1981) (City Council canceled license permitting concert because of dispute over content of performance).

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). Thus, the City cannot argue that the decision to prohibit Plaintiffs' speech was a one-time decision, and not a custom or policy. The *Pembaur* Court continued:

> Indeed, any other conclusion would be inconsistent with the principles underlying § 1983. To be sure, 'official policy' often refers to formal rules or understandings — often but not always committed to writing — that are intended to, and do, establish fixed plans of action to be followed under similar circumstances

26

consistently and over time . . . . However, as in *Owen* and *Newport*, a government frequently chooses a course of action tailored to a particular situation and not intended to control decisions in later situations. If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents an act of official government 'policy' as that term is commonly understood. More importantly, where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly.

*Id.* at 480-81 (internal footnote omitted).

The City's failure to train its law enforcement officers violated Plaintiffs' Fourteenth Amendment Due Process rights.

## V.    CONCLUSION

For the foregoing reasons the Code, as written, violates Plaintiffs' First Amendment Free Speech and Free Exercise Rights, and their Fourteenth Amendment Due Process rights. Defendants' application of the Code to Plaintiffs violated their First Amendment Free Speech and Free Exercise rights, and their Fourteenth Amendment Due Process rights. Because there is no genuine issue as to any material fact, Plaintiffs are entitled to judgment as a matter of law.

Dated this 30th day of August, 2019.

/s/ Keith Williams
Keith A. Williams, Esq.
P.O. Box 1965
321 South Evans Street, Suite 103
Greenville, NC 27835
Phone: 252/931-9362
Fax: 252/830-5155
E-mail: keith@williamslawonline.com
N.C. Bar Number 19333
Local Civil Rule 83.1(d) Counsel for
Plaintiffs

/s/ Frederick H. Nelson
Frederick H. Nelson, Esq.
Lead Trial Counsel for Plaintiffs
David J. Markese, Esq.
Co-counsel for Plaintiffs
**AMERICAN LIBERTIES INSTITUTE**
P.O. Box 547503
Orlando, FL 32854-7503
Telephone: (407) 786-7007
Facsimile: (877) 786-3573
Florida Bar No.: 0990523
E-mail: rick@ali-usa.org
Florida Bar No.: 0105041
E-mail: dmarkese@ali-usa.org
By special appearance under Local Civil
Rule 83.1(e) for Plaintiffs

## CERTIFICATE OF SERVICE

I hereby certify that on August 30, 2019, I served Plaintiffs' Motion for Summary

Judgment via this Court's CM/ECF system to:

Brian M. Love
N.C. Bar No. 41397
Natalia K. Isenberg
N.C. Bar No. 36842
4700 Falls of Neuse Road, Suite 450
Raleigh, North Carolina 27601
Telephone: (919) 873-0166
E-mail: blove@teaguecampbell.com
E-mail: nisenberg@teaguecampbell.com
Attorneys for Defendants

/s/ David J. Markese
Frederick H. Nelson, Esq.
Lead Trial Counsel for Plaintiffs
David J. Markese, Esq.
Co-counsel for Plaintiffs
**AMERICAN LIBERTIES INSTITUTE**
P.O. Box 547503
Orlando, FL 32854-7503
Telephone: (407) 786-7007
Facsimile: (877) 786-3573
Florida Bar No.: 0990523
E-mail: rick@ali-usa.org
Florida Bar No.: 0105041
E-mail: dmarkese@ali-usa.org
By special appearance under Local Civil
Rule 83.1(e) for Plaintiffs