IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
SOUTHERN DIVISION

NO. 7:18-CV-86-FL

| | | |
|---|---|---|
| PATRICK O'CONNELL and JASON CROWLEY, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | ORDER |
| CITY OF NEW BERN, NORTH CAROLINA and TODD CONWAY, in his individual capacity acting as a police officer for the City of New Bern, North Carolina, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

This matter comes before the court on the parties' cross-motions for summary judgment. (DE 34, 37). The issues raised have been fully briefed, and in this posture are ripe for ruling. For the reasons that follow, defendants' motion for summary judgment is granted in part and denied in part, and plaintiffs' motion for summary judgment is denied.

## STATEMENT OF THE CASE

Plaintiffs initiated this action on May 25, 2018, pursuant to 42 U.S.C. § 1983. Plaintiffs claim defendants violated their rights under the First and Fourteenth Amendments to the United States Constitution.[1] Plaintiffs moved for preliminary injunction on July 12, 2018, asking the court to enjoin enforcement of defendant City of New Bern's ("New Bern") picketing ordinance. See

---

[1]    To sustain a claim brought under § 1983, plaintiffs must show "the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." West v. Atkins, 487 U.S. 42, 48 (1988).

New Bern, N.C., Code of Ordinances ("Code") § 66-84(a), (b), and (d) (2019).[2]  The court denied

the motion on December 10, 2018, holding that, based on the record before it, plaintiffs lacked

standing to challenge § 66-84(b), and failed to show a likelihood of success on the merits as to

their constitutional challenges of § 66-84(a) or (d).

After an uneventful period of discovery, the parties filed the instant motions on August 30,

2019.  The parties collectively rely upon their own testimony;[3] the testimony of Brenda Blanco

("Blanco"), defendant New Bern's City Clerk; Mark Stephens ("Stephens"), defendant New

Bern's City Manager; and Toussaint Summers, Jr. ("Summers"), defendant New Bern's Chief of

Police; a map of Mumfest drawn by plaintiff Patrick O'Connell ("O'Connell"); manually filed

audio recordings labeled "VN520367," "VN520317," "151010_001," and "Mumfest," together

with transcriptions; and manually filed video recordings marked "MAH02855," "MAH02858,"

"MAH02860," "MAH02861," "MAH02862," "MAH02863," "MAH02867," and "MAH02870."

STATEMENT OF UNDISPUTED FACTS

The undisputed facts may be summarized as follows.   Mumfest is an annual fall festival

held for the last 37 years in defendant New Bern's historic downtown.  (Stephens Aff. (DE 22-2)

¶ 4).  The festival is open to the public free of charge, and Mumfest is not an expression of a

particular message.  (Id.; Conway Dep. (DE 36-3) 53:23–54:10).  The public is invited to enjoy a

variety of entertainment, attractions, exhibits, and food in defendant New Bern's historic

downtown and along its waterfront.  (Stephens Aff. (DE 22-2) ¶ 4).  Most of the attractions,

displays, exhibits, and vendors are located on defendant New Bern's sidewalks and streets.  (Id.;

---

[2]      Where the New Bern Code of Ordinances is a matter of public record, the court takes judicial notice of the provisions of the Code set forth herein.  See Fed. R. Evid. 201.

[3]      Defendant New Bern's designated deponent was Nick Lucas ("Lucas"), a captain with the New Bern Police Department.  See Fed. R. Civ. P. 30(b)(6).

Conway Dep. (DE 36-3) 54:11–22; O'Connell Decl. (DE 39) ¶¶ 6, 19; Crowley Decl. (DE 39) ¶ 6).

In 2015 and 2017, an estimated 100,000 people attended Mumfest each year. (Id. ¶ 6; Summers Aff. (DE 22-3) ¶ 4). During the festival, defendant New Bern's streets, sidewalks and public areas were densely crowded. (Stephens Aff. (DE 22-2) ¶ 6; Summers Aff. (DE 22-3) ¶ 5). Because of the small space in which Mumfest occurs relative to the size of the crowd, defendant New Bern has real and significant interests in maintaining public safety, crowd control, the flow of pedestrian and vehicular traffic, and access to buildings abutting public sidewalks and driveways. (Stephens Aff. (DE 22-2) ¶ 6; Summers Aff. (DE 22-3) ¶ 5).

Plaintiffs are individuals acting to spread awareness of their views regarding religious, political, and social topics. (O'Connell Decl. (DE 39) ¶¶ 3, 4; Crowley Decl. (DE 39) ¶¶ 3, 4). Specifically, plaintiffs' message is one of hope and salvation that Christianity offers. (O'Connell Decl. (DE 39) ¶ 25; Crowley Decl. (DE 39) ¶ 19). Plaintiffs share their faith in various ways, including distributing free literature, carrying portable signs or a replica of the cross of Christ's crucifixion, recording public events for commentary and distribution, and engaging others in respectful, one-on-one discussions about Jesus Christ and the Christian faith. (O'Connell Decl. (DE 39) ¶¶ 30–33; Crowley Decl. (DE 39) ¶¶ 17–20). In 2015 and 2017, plaintiffs attended Mumfest for the purpose of preaching the Gospel to festival attendees. (See O'Connell Decl. (DE 39) ¶ 35; Crowley Decl. (DE 39) ¶ 24).

A.    The Code

Defendant New Bern's local ordinances set forth conditions for picketing and definitions regarding the same, as follows:

Sec. 66-81. – Definitions . . . .

3

Picket or picketing means to make a public display or demonstration of sentiment for or against a person or cause, including protesting which may include the distribution of leaflets or handbills, the display of signs and any oral communication or speech, which may involve an effort to persuade or influence, including all expressive and symbolic conduct, whether active or passive.

Sidewalk means that portion of the street right-of-way which is designated for the use of pedestrians and may be paved or unpaved and shall include easements and rights-of-ways.

Street means the entire width between property or right-of-way lines of every way or place of whatever nature, when any part thereof is open to the use of the public as a matter or right, for the purposes of vehicular traffic, including that portion that is known as the shoulder of the roadway and the curb . . . .

Sec. 66-84 – Picketing Regulations.

a) Picketing may be conducted on public sidewalks, in any city-controlled park, or in other city owned areas normally used or reserved for pedestrian movement, including easements and rights-of-way, and shall not be conducted on the portion of the public roadway used primarily for vehicular traffic.

(b) Notwithstanding subsection (a), picketing may not be conducted:

> (1) On any city-controlled park during a festival that has been permitted at that particular property or when that property has been otherwise reserved for private use . . . .

c) Picketing shall not disrupt, block, obstruct or interfere with pedestrian or vehicular traffic . . . .

d) Written or printed placards or signs, flags, or banners carried by individuals engaged in picketing shall be of such a size and/ or carried on the sidewalks or other city-owned areas, as to allow safe and unobstructed passage of pedestrian or vehicular traffic. The staff or pole on which a sign, flag, or banner may be carried shall be made of corrugated material, plastic, or wood, and shall not exceed 40 inches in length and shall not be made of metal or metal alloy. If made of wood, the staff or pole shall be no greater than three-fourths inch in diameter at any point. A staff or pole must be blunt at both ends . . . .

f) Spectators of pickets shall not physically interfere with individuals engaged in picketing. Picketers and spectators of pickets shall not speak fighting words or threats that would tend to provoke a reasonable person to a breach of the peace.

Code §§ 66-81, 66-84; (see also Blanco Aff. (DE 22-1) ¶¶ 1–3, Ex. A).  In addition to defendant New Bern's picketing ordinance, the Code also includes a noise ordinance, which in pertinent part provides:

> Sec. 26-66 – General prohibitions; loud, raucous and disturbing noise.
>
> It shall be unlawful for any person or group of persons, regardless of number, willfully to make, continue, or cause to be made or continued, any loud, raucous and disturbing noise, which term shall mean any sound which because of its volume level, duration, and character annoys, disturbs, injures, or endangers the comfort, health, peace, or safety of reasonable persons of ordinary sensibilities within the limits of the city. The term 'loud, raucous and disturbing noise' shall be limited to loud, raucous and disturbing noises heard upon the public streets, in any public park, in any school or public building or upon the grounds thereof while in use, in any church or hospital or upon the grounds thereof while in use, upon any parking lot open to members of the public as invitees or licensees, or any occupied residential unit which is not the source of the noise or upon the grounds thereof.
>
> Sec. 26-67 – Prohibited noise activities.
>
> The following acts are hereby declared to be public nuisances in violation of the above section, but the acts enumerated in this section shall not be deemed to be exclusive:
>
>> (1) The use or operation of any mechanical or electrical device, apparatus, or instrument to amplify, intensify, or reproduce the human voice, or to produce, reproduce, intensify, or amplify any other sound when the sound from such activity is clearly audible more than 100 feet from the device, apparatus, or instrument . . . .

Code §§ 26-66, 26-67.

B.     Mumfest 2015

In 2015, several of defendant New Bern's police officers approached plaintiffs and their group when they arrived at Mumfest and told them that they could not bring their nine-foot cross into the festival because it was taller than 40 inches and more than three-quarter inches in diameter. (MAH02855 at 00:00–00:32; O'Connell Dep. (DE 36-1) 18:18–25; Crowley Dep. (DE 36-2)

10:16–23; see Pl. Opp. Statement of Facts (DE 50) ¶ 9).[4]  Plaintiff O'Connell asked to talk to the officer's supervisor.  (MAH02855 at 00:40–00:52; O'Connell Dep. (DE 36-1) 18:23–19:1).  Defendant Conway, who was supervisor at that time, reiterated the officers' point, telling plaintiff O'Connell that he could not bring the cross into the event because it was taller than 40 inches and more than three-quarter inches in diameter.[5]  (Conway Dep. (DE 36-3) 74:8–18, 95:23–96:12).  Plaintiff O'Connell nonetheless attempted to enter the festival with his cross but was physically blocked by the officers.  (O'Connell Dep. (DE 36-1) 19:1–4).

Shortly thereafter, plaintiff O'Connell stood on a step stool in the middle of the road adjacent to barricades at the Middle and Broad Street intersection, and he used a megaphone to preach to individuals inside Mumfest.  (MAH02858 at 00:00–00:05; O'Connell Dep. (DE 36-1) 35:22–36:13; O'Connell Dep. Ex. 1 (DE 36-5); O'Connell Decl. (DE 39) ¶ 9; Pl. Opp. Statement of Facts (DE 50) ¶ 11).  Officers approached plaintiffs at the barricade and advised them multiple times that they could not use the megaphone that amplifies sound more than 100 feet, pursuant to defendant New Bern's noise ordinance.  (MAH02858 at 00:05–00:11, 00:45–02:11).  Defendant Conway then spoke with plaintiff Jason Crowley ("Crowley"), warning him that he could hear the megaphone from 100 feet away and that plaintiff O'Connell would receive a citation if he did not turn the megaphone down.  (MAH02858 at 02:20–02:34, 03:24–03:52).  Plaintiff Crowley asked to see the supervisor at the festival, and defendant Conway responded that he was the supervisor at Mumfest that day.  (MAH02858 at 03:52–04:16; see Conway Dep. (DE 36-3) 44:13–45:1).

---

[4]  All citations herein to video and audio recordings are to the time stamp in minutes and seconds (e.g., "00:00") appearing in the player on which the court viewed the video, VLC Media Player.

[5]  At deposition, defendants conceded that applying the three-quarter inches requirement to objects that are not wood exceeded the requirements of Code § 66-84(d).  (See Conway Dep. (DE 36-3) 96:5–97:25; Lucas Dep. (DE 36-4) 53:17–54:8).  The cross was made from PVC, not wood.  (See O'Connell Dep. (DE 36-1) 68:2–4).

After plaintiffs were told to turn down the megaphone, defendant Conway instructed plaintiffs to move because a paid performer was setting up in the intersection and plaintiffs were interfering with the performance.  (MAH02858 at 05:32–05:55; Crowley Dep. (DE 36-2) 11:8–9; Conway Dep. (DE 36-3) 99:9–18).  Plaintiff O'Connell continued to preach for several minutes.  (MAH02858 at 05:55–10:07).  Defendant Conway again instructed plaintiffs to move, under threat of arrest.  (MAH02858 at 10:08–10:18).  Under protest, plaintiffs moved to the sidewalk adjacent to the intersection, where they preached for the rest of the day.  (MAH02858 at 10:18–11:14; see O'Connell Dep. (DE 36-1) 47:10–14; Crowley Dep. (DE 36-2) 11:11–15; MAH02860; MAH02861; MAH02863; MAH02867; MAH02870).

Shortly after moving, defendant Conway instructed two firefighters to park their utility vehicle between plaintiffs and the festival attendees gathered in the in intersection, and defendant Conway directed them to place the cart in reverse so it would make a beeping sound.  (MAH02858 at 11:15–12:16; Crowley Dep. (DE 36-2) 12:2–7; see Conway Dep. (DE 36-3) 102:22–103:15; O'Connell Decl. (DE 39) ¶ 10; Crowley Decl. (DE 36-2) ¶ 9).  Plaintiff Crowley and his associates asked defendant Conway to instruct the firefighters to turn the buzzer off, but defendant Conway refused, saying that it was not his cart and he could not make them turn it off.  (MAH02858 at 12:17–12:51).  Later in the day, defendant Conway returned with another utility cart he was driving, positioned it between plaintiffs and festivalgoers, and placed it in reverse to create a beeping noise.  (See Crowley Dep. (DE 36-2) 12:7–8; O'Connell Decl. (DE 39) ¶ 10; Crowley Decl. (DE 36-2) ¶ 9).

At several other points during the day, plaintiffs and their associates entered the festival area to preach and distribute literature.  (See, e.g., MAH02862; MAH02867; 151010_001 at 1:23:09–1:24:27; Crowley Dep. (DE 36-2) 11:15–24).  However, defendant Conway, relying on

Mumfest rules promulgated by the festival organizer, told plaintiff Crowley he was not allowed to distribute literature in the festival area. (See O'Connell Dep. (DE 36-1) 106:14–20; Crowley Dep. (DE 36-2) 11:11–24, 21:21–23, 26:20–27:25, 38:7–8, 42:8–19; Conway Dep. (DE 36-3) 56:15–25, 59:25–60:16). Another officer told plaintiffs' group that they were not allowed to stand in the middle of the festival, and instructed Job Crowley, plaintiff Crowley's brother, to move off to the side of the road. (See 151010_001 at 1:25:00–1:25:27). In total, plaintiffs and their group were in New Bern for Mumfest 2015 for several hours. (See O'Connell Dep. (DE 36-1) 18:3–5).

C.       Mumfest 2017

Plaintiff O'Connell attempted to attend Mumfest to preach the gospel inside the event. (O'Connell Dep. (DE 36-1) 63:24–25). Plaintiff O'Connell entered the festival at the traffic circle and preached for about two or three hours. (O'Connell Dep. (DE 36-1) 64:1–3, 65:8–67:6, 69:2–5; O'Connell Dep. Ex. 1 (DE 36-5)). After about the first hour and a half, he was approached by officer Wilson, who told him that he needed to take the cross out of the festival area and keep moving. (O'Connell Dep. (DE 36–1) 64:4–9, 70:16–22). After plaintiff O'Connell requested to speak to Wilson's supervisor, Sergeant Sneeden arrived. (O'Connell Dep. (DE 36-1) 64:10–64:16). Sneeden agreed that plaintiff O'Connell did not need to take the cross out of the festival, but it had to be disassembled. (O'Connell Dep. (DE 36-1) 65:3–7). The cross is approximately 30 inches when disassembled, though it is not part of plaintiff O'Connell's message when disassembled. (O'Connell Dep. (DE 36-1) 126:3–20). Plaintiff O'Connell kept his cross collapsed during the entire time he preached in order to avoid arrest. (O'Connell Dep. (DE 36-1) 68:1–16, 70:4–12).

In both 2015 and 2017, other individuals were allowed to carry five-foot-tall "windmills" on the sidewalks and streets in and around the Mumfest festival areas, during the Mumfest festival. (O'Connell Decl. (DE 39) ¶ 12; Crowley Decl (DE 39) ¶ 11).

D.    Planned Future Activities

Plaintiffs have concrete plans on upcoming days from present to December 2022 to go to defendant New Bern's public spaces during festivals and other events to share their religious message with the public.  (O'Connell Decl. (DE 39) ¶ 33; Crowley Decl. (DE 39) ¶ 22).

Additional facts pertinent to the instant motions will be discussed below.

**COURT'S DISCUSSION**

A.    Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial."  Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986) (internal quotation omitted).  Only disputes between the parties over facts that might affect the outcome of the case properly preclude the entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247–48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine"

only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party).

"[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted). Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture." Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005). By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied. Id. at 489–90.

B.      Standing

The United States Constitution extends the subject matter jurisdiction of the federal judiciary to "cases" or "controversies." U.S. Const. art. III, § 2, cl. 1. "Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy." Spokeo, Inc. v. Robins, 136 S.

Ct. 1540, 1547 (2016). The United States Supreme Court has explained, "the irreducible constitutional minimum of standing contains three elements." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). To have standing, a plaintiff must show 1) an "injury in fact," meaning an injury that is "concrete and particularized" and "actual or imminent;" 2) a "causal connection between the injury and the conduct complained of," meaning that the injury is "fairly traceable" to the defendant's actions; and 3) a likelihood that the injury "will be redressed by a favorable decision." Id. at 560–61. Lack of standing is a deficiency that places litigation outside the court's subject matter jurisdiction. See S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC, 713 F.3d 175, 185 (4th Cir. 2013).

Key to the standing inquiry in this case is that "[a]lthough there is broad latitude given facial challenges in the First Amendment context, a plaintiff must establish that he has standing to challenge each provision of an ordinance by showing that he was injured by application of those provisions." Covenant Media Of SC, LLC v. City Of N. Charleston, 493 F.3d 421, 429–30 (4th Cir. 2007) (citations omitted) (emphasis added). Thus, a finding that a plaintiff has standing to bring suit challenging one provision of an ordinance "does not provide it a passport to explore the constitutionality of every provision . . . ." Id. at 429. A plaintiff may allege standing for imminent injury by showing they will engage in conduct at least arguably protected by their constitutional rights but also proscribed by the challenged law, and that there is a "credible threat" of the law being enforced against them when they do so. Susan B. Anthony List v. Driehaus, 573 U.S. 149, 159 (2014) (citing Babbitt v. Farm Workers, 442 U.S. 289, 298 (1979)); Abbott v. Pastides, 900 F.3d 160, 176 (4th Cir. 2018); Kenny v. Wilson, 885 F.3d 280, 288 (4th Cir. 2018).

Here, plaintiffs generally demonstrate injuries in fact that give rise to a justiciable case or controversy. The undisputed facts include that law enforcement prohibited plaintiffs from bringing

a cross onto public streets, prevented plaintiffs from using a megaphone, ordered plaintiffs to move from where they were preaching, and placed a cart emitting a beeping noise in front of plaintiffs. (See, e.g., MAH02855, MAH02858). Defendants expressly relied upon §§ 26-67 and 66-84(d) to forbid plaintiffs' activities. (MAH02855 at 00:00–00:32; MAH02858 at 00:05–00:11, 00:45–02:11, 02:20–02:34, 03:24–03:52; Conway Dep. (DE 36-3) 95:23–96:12). They applied § 66-84(a) and festival rules to remove plaintiffs from the roadway. (See Conway Dep. (DE 36-3) 56:15–59:1; Lucas Dep. (DE 36-4) 41:16–43:17). Despite defendants' argument to the contrary, plaintiffs have standing to assert most of their claims in the instant case.

The one provision that plaintiffs do not have standing to challenge is § 66-84(b). As noted above, the Code provides that "[p]icketing may be conducted . . . in any city-controlled park." Code § 66-84(a). "Notwithstanding subsection (a), picketing may not be conducted: 1) On any city-controlled park during a festival that has been permitted at that particular property or when that property has been otherwise reserved for private use." Id. § 66-84(b). Plaintiffs generally testify that they were not allowed to enter the festival area at Mumfest to preach or to distribute literature. (O'Connell Dep. (DE 36-1) 106:14–20; Crowley Dep. (DE 36-2) 11:11–24, 21:21–23, 26:20–27:25, 38:7–8, 42:8–19). However, the transactions or occurrences in the instant case took place on the streets and sidewalks of New Bern, rather than a city park. (See O'Connell Dep. (DE 36-1) 18:20–20:19, 23:4–25:15, 26:18–25, 56:1–57:5, 65:8–67:6; O'Connell Dep. Ex. 1 (DE 36-5); Crowley Dep. (DE 36-2) 11:11–24, 12:9–13:3, 13:18–14:2).

Plaintiffs have previously asserted that, based on their experiences at Mumfest in 2015 and 2017, they expect defendants to enforce § 66-84(b). Where the record does not disclose that any of plaintiffs' activities involved exercise of constitutional rights at a city park, plaintiffs fail to show a credible threat of enforcement of § 66-84(b). See, e.g., Steffel v. Thompson, 415 U.S. 452,

459 (1974) (finding a credible threat of enforcement where plaintiff had twice been warned to stop handbilling at a shopping center and admonished that if he disobeyed the officer's warning to stop he likely would be prosecuted). Where the court lacks subject matter jurisdiction over plaintiffs' claims pertaining to § 66-84(b), those claims are dismissed without prejudice. Fed. R. Civ. P. 12(h)(3).

C.    Freedom of Speech

"Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. "The freedom of speech and of the press, which are secured by the First Amendment against abridgment by the United States, are among the fundamental personal rights and liberties which are secured to all persons by the Fourteenth Amendment against abridgment by a state." Thornhill v. State of Alabama, 310 U.S. 88, 95 (1940). "It is important to note that while it is the Fourteenth Amendment which bears directly upon the State it is the more specific limiting principles of the First Amendment that finally govern this case." W. Virginia State Bd. of Educ. v. Barnette, 319 U.S. 624, 639 (1943).

The court's inquiry into a freedom of speech claim proceeds in three steps: 1) the court determines if the activity is speech protected by the First Amendment, 2) the court identifies the forum at issue in the instant case, and 3) the court determines whether the justifications for exclusion from the relevant forum satisfy the requisite standard. Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 797 (1985).

The court readily disposes of the first two parts of its inquiry. "There is no doubt that as a general matter peaceful picketing and leafletting are expressive activities involving 'speech' protected by the First Amendment." United States v. Grace, 461 U.S. 171, 176 (1983). Plaintiffs' activities fall within the category of protected speech. See Code § 66-81; (O'Connell Decl. (DE

39) ¶¶ 3, 4, 25, 30–33; Crowley Decl. (DE 39) ¶¶ 3, 4, 17–20). In addition, "all public streets are held in the public trust and are properly considered traditional public fora." Frisby v. Schultz, 487 U.S. 474, 481 (1988); Hague v. Comm. for Indus. Org., 307 U.S. 496, 515–16 (1939). The transactions or occurrences in the instant case all occurred on the streets and sidewalks of New Bern. (See O'Connell Dep. (DE 36-1) 18:20–20:19, 23:4–25:15, 26:18–25, 56:1–57:5, 65:8–67:6; O'Connell Dep. Ex. 1 (DE 36-5); Crowley Dep. (DE 36-2) 11:11–24, 12:9–13:3, 13:18–14:2); see also Code § 66-84(a). Therefore, the restrictions on plaintiffs' protected speech were applied in a traditional public forum.

The government may impose restrictions on the time, place, and manner of speech protected by the First Amendment, provided that those restrictions "[1] are justified without reference to the content of the regulated speech, [2] that they are narrowly tailored to serve a significant governmental interest, and [3] that they leave open ample alternative channels for communication of the information." Ward v. Rock Against Racism, 491 U.S. 781, 791 (1989) (quoting Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 293 (1984)). The pertinent issue with respect to content neutrality is whether the city has regulated speech "because of disagreement with the message it contains." Hill v. Colorado, 530 U.S. 703, 719 (2000) (citations omitted).

"[T]he existence of a governmental interest may be established by reference to case law." Reynolds v. Middleton, 779 F.3d 222, 228 (4th Cir. 2015). As recognized by the United States Supreme Court, defendants' interests in "ensuring public safety and order" and "promoting the free flow of traffic and sidewalks" are legitimate, significant governmental interests. McCullen v. Coakley, 573 U.S. 464, 486–87 (2014); see also Heffron v. Int'l Soc. for Krishna Consciousness, Inc., 452 U.S. 640, 651 (1981) ("The flow of the crowd and demands of safety are more pressing

in the context of the Fair."). Defendants also have a significant interest in regulating loud and raucous noises. City of Cincinnati v. Discovery Network, Inc., 507 U.S. 410, 428 (1993); Kovacs v. Cooper, 336 U.S. 77, 87–89 (1949) (Reed, J.).

"That the Government's asserted interests are important in the abstract does not mean, however, that the [challenged action] will in fact advance those interests." Turner Broad. Sys., Inc. v. F.C.C., 512 U.S. 622, 664 (1994). A content-neutral regulation is narrowly tailored if it does not "burden substantially more speech than is necessary to further the government's legitimate interests." McCullen, 134 S. Ct. at 2535. The Code's regulations on picketing "need not be the least restrictive or least intrusive means" of serving the city's legitimate governmental interests. Ward, 491 U.S. at 798. Although defendants need not "present a panoply of empirical evidence in order to satisfy this standard, [they] must nonetheless make some evidentiary showing that the recited harms are real, not merely conjectural, and that the [challenged regulation] alleviates these harms in a direct and material way." Reynolds, 779 F.3d at 227–28 (emphasis in original).

Finally, a valid time, place, and manner restriction leaves open "ample alternative channels for communication" when other times, places, or manners of communication allow the "ability to communicate effectively" and allow "the more general dissemination of a message." Frisby, 487 U.S. at 483; Members of City Council of City of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 812 (1984); see also City of Renton v. Playtime Theatres, Inc., 475 U.S. 41, 54 (1986).

1.     As-Applied Claims

Plaintiffs' as applied claims involve four distinct challenges: 1) plaintiff O'Connell being restricted from bringing his cross into Mumfest or expanding the cross, 2) plaintiffs being prohibiting from using a megaphone, 3) plaintiff Crowley being told he could not distribute

literature inside Mumfest, and 4) plaintiffs being ordered from the roadway and having a cart placed in front of them with a beeping noise emanating from the cart.

Turning first to plaintiff O'Connell being prohibited from bringing his cross into Mumfest or expanding his cross, application of the prohibition on picketers bringing items over 40 inches tall into the festival was content neutral. (See MAH02855 at 00:00–00:32; Conway Dep. (DE 36-3) 95:23–96:12). Like Heffron, application of § 66-84(d) during Mumfest, with 100,000 attendees travelling around defendant New Bern's streets during the festival, serves significant public interests in managing traffic flow and public safety. 452 U.S. at 651; Green v. City Of Raleigh, 523 F.3d 293, 301 (4th Cir. 2008); Code § 66-84(c), (d); (see Stephens Aff. (DE 22-2) ¶ 6; Summers Aff. (DE 22-3) ¶¶ 4, 5). The ordinance is narrowly tailored based on a specific height requirement of 40 inches, as well as other conditions not in issue for plaintiff O'Connell's cross. Code § 66-84(d); (MAH02855 at 00:00–00:32; Conway Dep. (DE 36-3) 95:23–96:12; see O'Connell Dep. (DE 36-1) 126:3–7; Lucas Dep. (DE 36-4) 53:10–13). Finally, plaintiff O'Connell had ample alternative channels of communication to disseminate his religious message. Specifically, he could have carried a cross into the festival to aid in disseminating his message if the cross was no more than 40 inches tall, or that he could display the nine-foot cross on the public sidewalks and streets outside the festival area. Code § 66-84(d); (Conway Dep. (DE 36-1) 95:23–96:2; Conway Decl. (DE 22-4) ¶ 13).

Plaintiff O'Connell argues that the government fails to demonstrate that prohibiting his nine-foot cross was content neutral or served significant government interests in public safety and traffic flow, because festival attendees could carry five-foot-tall "windmills" in the festival. (O'Connell Decl. (DE 39) ¶ 12; Crowley Decl. (DE 39) ¶ 11). Plaintiffs' testimony does not raise a meaningful comparison, where plaintiffs fail to come forward with facts showing the festival

attendees carrying windmills were subject to defendant New Bern's picketing ordinance or were engaging in expressive activity.  <u>See</u> Code §§ 66-81, 66-84(d).  Plaintiffs also argue that application of the ordinance is not narrowly tailored, because it only applies a height requirement. (Pl. Resp. (DE 49) at 6).  This is an incorrect statement of law, where the applicable ordinance sets forth restrictions based on material, height, diameter (for wooden objects), and bluntness.  Code § 66-84(d).  As noted above, defendant New Bern's restriction on picketers' staves and poles "need not be the least restrictive or least intrusive means" of serving defendant New Bern's legitimate governmental interests.  <u>Ward</u>, 491 U.S. at 798.  Thus, defendants' application of § 66-84(d) to plaintiff O'Connell's cross for failure to comply with the ordinance's length requirement is a valid time, place, and manner restriction.

Second, plaintiffs' claim that defendants violated plaintiffs' rights by not allowing them to use a megaphone to preach.  The restriction of sound amplification devices under § 26-67 is content neutral, where application of the ordinance did not depend on the fact that plaintiffs were using the megaphone to project a religious message to festivalgoers.  <u>See</u> Code §§ 26-66, 26-67.  In the instant case, application of the ordinance advances a significant government interest in restricting loud and raucous noises.  Code § 26-66; <u>see</u> <u>Ward</u>, 491 U.S. at 803; <u>City of Cincinnati</u>, 507 U.S. at 428.  The ordinance furthered this interest in a narrowly tailored manner by setting a 100-foot noise limitation for sound amplification devices.  (MAH02858 at 00:05–00:28, 00:45–02:11, 2:20– 02:34,  03:24–03:52).    Finally,  plaintiffs  were  allowed  ample  alternative  channels  of communication.  They were not prohibited from using the megaphone at a lower volume, and they were  free  to  preach  using  their  voices  without  amplification.    (MAH02858 at 02:20–02:28; Conway Dep. (DE 36-3) 79:12–80:20).  Plaintiffs argue that defendants have not identified a significant government interest to which the noise ordinance applies, and that the noise ordinance

is not narrowly tailored. (Pl. Resp. (DE 49) at 6–7). For the reasons noted above, this argument is without merit. Thus, application of the noise ordinance to plaintiffs' use of a megaphone did not impermissibly restrict plaintiffs' religious message to Mumfest attendees in violation of the First Amendment.

Third, plaintiff Crowley claims defendants violated his constitutional rights by telling him not to distribute literature inside the festival area in 2015. It is undisputed that defendant Conway told plaintiff Crowley that he could not distribute literature, and if he did so, he could be asked to leave and then arrested for trespass under festival rules. (See O'Connell Dep. (DE 36-1) 106:14–20; Crowley Dep. (DE 36-2) 11:11–24, 21:21–23, 26:20–27:25, 38:7–8, 42:8–19; Conway Dep. (DE 36-3) 56:15–25, 59:25–60:16; 151010_001 at 1:28:00–1:28:54). In the instant case, application of rule prohibiting literature distribution except on the sidewalk or at a vendor booth is content neutral. (See 151010_001 at 1:28:00–1:28:54; Conway Dep. (DE 36-1) 84:16–85:12). The rule is narrowly tailored to serve a significant government interest in controlling the flow of traffic on defendant New Bern's streets, considering Mumfest's large number of attendees. (See Stephens Aff. (DE 22-2) ¶ 6; Summers Aff. (DE 22-3) ¶ 5); see Heffron, 452 U.S. at 649–50; Code § 66-84(a). Moreover, plaintiff Crowley had ample alternative channels of communication, where he was able to converse with festival attendees, distribute literature to attendees on the public sidewalks adjoining Mumfest, and could have rented a booth at Mumfest to distribute literature but did not to do so. (151010_001 at 1:23:10–1:24:26, 1:32:49–1:33:20; Crowley Dep. (DE 36-2) 48:4–7; see O'Connell Decl. (DE 39) ¶ 11; Crowley Decl. (DE 39) ¶ 10).

Plaintiff Crowley argues that his efforts to distribute literature are not analogous to Heffron. The court rejects plaintiff Crowley's argument. In Heffron, the Supreme Court considered whether a state fair rule prohibiting sale or distribution of printed or written material except from fixed

locations at vendor booths was an impermissible time, place, and manner restriction. 452 U.S. at 643–44. The Court held that limiting distribution of literature at the state fair except at fixed locations was a valid restriction. Id. at 648–55. Plaintiff Crowley argues that the festival rule in the instant case vests officers with "unbridled discretion," citing Heffron's discussion of booth allocation. Heffron, 452 U.S. at 649; see Thomas v. Chicago Park Dist., 534 U.S. 316, 323 (2002). However, plaintiff Crowley never sought to use a vendor booth, and he does not present any evidence that booths are arbitrarily allocated at Mumfest. (Crowley Dep. (DE 36-2) 48:4–7). In addition, the festival rule is not so vague as to vest unbridled discretion in defendants. According to the festival organizer, literature distribution was prohibited in the vendor booth area if the person seeking to distribute literature is not stationed at a booth. (See 151010_001 at 1:28:00–1:28:54; Conway Dep. (DE 36-1) 84:16–85:12).

Plaintiff Crowley also argues that the festival rule did not leave ample alternative channels of communication. In Heffron, the religious speakers were able to "mingle with the crowd and orally propagate their views," "arrange for a booth and distribute . . . literature," or distribute literature anywhere outside the fairgrounds. 452 U.S. at 654–55. Plaintiff Crowley argues, without support from the record, that he was "banned" from orally propagating his views by preaching at Mumfest. The only evidence in the record is plaintiff Crowley's brother Job Crowley was asked to step to the side of the road to preach, as opposed to the middle of the road, at Mumfest. (See Crowley Dep. (DE 36-2) 11:11–25, 23:16–24, 35:19–20, 37:20–38:19, 42:17–24; 151010_001 at 1:25:00–1:25:27; Mumfest at 1:33:19–1:33:36). Accordingly, the Mumfest anti-solicitation rule did not violate plaintiff Crowley's First Amendment rights.

Finally, plaintiffs challenge defendant Conway's decision to remove them from the roadway, and his decision to place a beeping cart in front of plaintiffs on two different occasions

in 2015. Defendant Conway applied § 66-84(a) by telling plaintiff O'Connell "you are now on a city property, you are on a city road, and you are not allowed to be in a road." (MAH02858 at 10:17–10:26; see also Lucas Dep. (DE 36-4) 56:12–57:19). After plaintiffs complied with defendant Conway's order to move under protest, defendant Conway instructed two firefighters to park their utility vehicle between plaintiffs and the festival attendees, such that it would make a beeping sound. (MAH02858 at 11:15–12:16; Crowley Dep. (DE 36-2) 12:2–7; see Conway Dep. (DE 36-3) 102:22–103:15; O'Connell Decl. (DE 39) ¶ 10; Crowley Decl. (DE 36-2) ¶ 9). Defendant Conway returned later during 2015 and again placed a beeping utility cart between plaintiffs and festival attendees. (Conway Dep. (DE 36-3) 105:6–12).

Defendant Conway testified that he applied § 66-84(a) to plaintiffs and placed a beeping cart in between plaintiffs and festival attendees because people were "getting aggravated" and "becoming aggressive" towards plaintiffs' group.[6] (See Conway Dep. (DE 36-3) 99:13–101:7, 105:6–12). Defendant Conway testified that individuals waived a rainbow flag in plaintiff O'Connell's face and yelled at him. (Conway Dep. (DE 36-3) 106:13–21, 108:2–16, 111:16–21). In the past, individuals threw Mountain Dew bottles at plaintiff O'Connell, threatened plaintiff O'Connell with violence, and assaulted the police officers guarding plaintiff O'Connell. (See O'Connell (DE 36-1) 129:17–23; Conway Dep. (DE 36-3) 105:22–24, 110:6–20).

Because "[l]isteners' reaction to speech is not a content-neutral basis for regulation," the court applies strict scrutiny to defendant Conway's decision to order plaintiffs to the sidewalk and place a beeping cart between them and festival attendees in 2015. Forsyth Cty., Ga. v. Nationalist Movement, 505 U.S. 123, 134 (1992). When state action restricts constitutionally protected speech

---

[6] The court observes that, when plaintiffs' group asked defendant Conway to order the firefighters to move the cart, defendant Conway indicated he did not have the authority to make the firefighters move, even though he later testified that he directed the firefighters to park there in the first place. (MAH02858 at 12:17–12:51; Conway Dep. (DE 36-3) 103:1–15).

based on content, "the state action may be sustained only if the government can show that the regulation is a precisely drawn means of serving a compelling state interest." Consol. Edison Co. of New York v. Pub. Serv. Comm'n of New York, 447 U.S. 530, 540 (1980). "[C]onstitutional rights may not be denied simply because of hostility to their assertion or exercise." Watson v. City of Memphis, 373 U.S. 526, 535 (1963); Terminiello v. City of Chicago, 337 U.S. 1, 5 (1949). However, "[w]hen clear and present danger of riot, disorder, interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears, the power of the state to prevent or punish is obvious." Cantwell v. State of Connecticut, 310 U.S. 296, 308 (1940); see Terminiello, 337 U.S. at 4.

The evidence is susceptible of more than one reasonable inference as to whether defendant Conway's actions were narrowly tailored to respond to a compelling state interest. Defendant Conway repeatedly testifies that although no violence or threats of violence had yet occurred at Mumfest, he anticipated violence based on the reactions of the crowd to plaintiffs' speech, as well as prior encounters between plaintiffs and Mumfest attendees. (See Conway Dep. (DE 36-1) 101:2–102:7, 106:7–21, 110:6–20, 114:1–24, 117:12–17). However, the footage of defendant Conway calling over the utility cart to separate plaintiffs from the crowd does not readily disclose any acts portending violence by festival attendees. (MAH02858 at 11:15–12:16). Other video footage demonstrates provides the basis for an inference that, even where festival attendees challenged plaintiffs, challenges did not result in altercations. (See, e.g., MAH02863; MAH02867). Plaintiff Crowley also testifies that in 2015 there was no threat of violence. (Crowley Dep. (DE 36-2) 53:2–4). As such, there is a genuine issue of material fact regarding

whether defendant Conway's actions appropriately redressed a threat to public safety caused by spectators reacting to plaintiffs' preaching.[7]

In sum, the court dismisses plaintiffs' as applied claims based on plaintiff O'Connell carrying a nine-foot-tall cross, plaintiffs' use of a megaphone, and plaintiff Crowley being prohibited from distributing literature in the vendor area at the festival. Plaintiffs' claim that their First Amendment rights were infringed by defendant Conway moving them from the barricaded roadway to the sidewalk and placing a beeping utility cart in front of them will be allowed to proceed to trial.

2.    Overbreadth

Plaintiffs specifically challenge two provisions of defendant New Bern's picketing ordinance: § 66-84(a) and (d). Plaintiffs contend that each of these statutes is overbroad and vague.

Generally, to challenge the facial validity of a statute, "the challenger must establish that no set of circumstances exists under which the Act would be valid." United States v. Salerno, 481 U.S. 739, 745 (1987). "The First Amendment doctrine of overbreadth is an exception to [the] normal rule regarding the standards for facial challenges." Virginia v. Hicks, 539 U.S. 113, 118 (2003). Under the doctrine,

> an individual whose own speech or conduct may be prohibited is permitted to challenge a statute on its face 'because it also threatens others not before the court— those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid.'

---

[7]      For the same reasons that the court submits to the jury the question of whether defendant Conway's action violates a constitutional right, it reserves ruling on whether defendant Conway's conduct violates a clearly established constitutional right. See Willingham v. Crooke, 412 F.3d 553, 560 (4th Cir. 2005) ("[T]o the extent that a dispute of material fact precludes a conclusive ruling on qualified immunity at the summary judgment stage, the district court should submit factual questions to the jury and reserve for itself the legal question of whether the defendant is entitled to qualified immunity on the facts found by the jury.").

Bd. of Airport Comm'rs of City of Los Angeles v. Jews for Jesus, Inc., 482 U.S. 569, 574 (1987) (quoting Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 503 (1985)).

The overbreadth doctrine balances the social costs of overbroad laws chilling constitutionally protected speech against the state's ability to regulate constitutionally unprotected conduct. Hicks, 539 U.S. at 119–20. Because invalidating a statute for overbreadth is "strong medicine" that is not "casually employed," "there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds." Los Angeles Police Dept. v. United Reporting Publishing Corp., 528 U.S. 32, 39 (1999); City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 801 (1984). "Only a statute that is substantially overbroad may be invalidated on its face." City of Houston, Tex. v. Hill, 482 U.S. 451, 458 (1987).

"The first step in overbreadth analysis is to construe the challenged statute; it is impossible to determine whether a statute reaches too far without first knowing what the statute covers." United States v. Williams, 553 U.S. 285, 293 (2008). The second step in the overbreadth analysis is to determine "whether the statute, as we have construed it, [restricts] a substantial amount of protected expressive activity." Id. at 297. Whether a restriction is "substantial" must be "judged in relation to the statute's plainly legitimate sweep." Broadrick v. Oklahoma, 413 U.S. 601, 615 (1973). Finally, the court must evaluate the ordinance to determine if "a limiting construction or partial invalidation so narrows it as to remove the seeming threat or deterrence to constitutionally protected expression." Id. at 613.

The court only considers overbreadth if it determines that a challenged law is valid as applied in the instant case. Bd. of Trustees of State Univ. of New York v. Fox, 492 U.S. 469, 484–85 (1989). Where the court leaves for trial the issue of whether § 66-84(a) was unconstitutionally

applied to plaintiffs, it does not reach plaintiffs' overbreadth challenge to § 66-84(a) until it resolves plaintiffs' as applied challenge to application of § 66-84(a). See id. Plaintiffs may renew their overbreadth challenge to § 66-84(a) with a motion for judgment as a matter of law. Fed. R. Civ. P. 50.

Turning to § 66-84(d), the ordinance is content neutral, as it does not address the specific message invoked by the signs, flags, or banners carried on staves or poles. The stated purpose of § 66-84(d) is "to allow safe and unobstructed passage of pedestrian or vehicular traffic" on sidewalks or other city-owned areas. Id. These purposes are recognized as substantial government interests. See McCullen v. Coakley, 573 U.S. 464, 486 (2014). Moreover, the ordinance narrowly tailors the restriction by providing that a staff or pole used to support a sign, flag, or banner

> shall be made of corrugated material, plastic, or wood, and shall not exceed 40 inches in length and shall not be made of metal or metal alloy. If made of wood, the staff or pole shall be no greater than three-fourths inch in diameter at any point. A staff or pole must be blunt at both ends.

Code § 66-84(d). Finally, the ordinance leaves ample alternative channels of communication, where it merely places conditions on use of staves or poles used to generally disseminate a picketer's message but does not exclude use of poles or staves within the specified guidelines, or any other means by which a picketer might communicate his or her message.

Plaintiffs argue that § 66-84(d) vests officers with "unbridled discretion." See Thomas v. Chicago Park Dist., 534 U.S. 316, 323 (2002). On its face, the applicable ordinance sets forth restrictions for staves and poles based on material, high, diameter (for wooden objects), and bluntness. Code § 66-84(d). In sum, § 66-84(d) does not restrict a substantial amount of expressive activity, judged in relation to the picketing activities encompassed by its plainly legitimate sweep. Thus, the court grants defendants' motion for summary judgment as to plaintiffs' facial challenge of § 66-84(d).

D.      Free Exercise of Religion

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."  U.S. Const. amend. I.  "The Fourteenth Amendment has rendered the legislatures of the states as incompetent as Congress to enact such laws."  Cantwell, 310 U.S. at 303.  "[T]he protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons."  Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 532 (1993). In such instances, state action is constitutionally valid only if it is narrowly tailored to achieve a compelling state interest.  Id. at 546.  However, "the Free Exercise Clause does not inhibit enforcement of otherwise valid regulations of general application that incidentally burden religious conduct."[8]  Christian Legal Soc. Chapter of the Univ. of California, Hastings Coll. of the Law v. Martinez, 561 U.S. 661, 697 n.27 (2010) (citing Employment Div., Dept. of Human Resources of Ore. v. Smith, 494 U.S. 872, 878–82 (1990)).

For the reasons set forth above in the court's discussion of plaintiffs' right to free speech, the court determines that almost all of plaintiffs' claims concern neutral regulations of general applicability that incidentally burden plaintiffs' religious conduct.  The only exception is defendant Conway's decision to move plaintiffs from Middle Street to the sidewalk and to place a beeping cart in front of plaintiffs while preaching.  As discussed above, these actions were taken due to the crowd's response to plaintiffs' religious message.  Therefore, they are subject to strict scrutiny.  At

---

[8]      Congress responded to the Smith decision by enacting the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. § 2000bb et seq.  Holt v. Hobbs, 574 U.S. 352, 356 (2015).  RFRA places limits on the government's ability to substantially burden exercise of religion "even if the burden results from a rule of general applicability."  42 U.S.C. § 2000bb–1.  However, RFRA applies only to federal law.  42 U.S.C. § 2000bb-3; see also City of Boerne v. Flores, 521 U.S. 507, 536 (1997) (holding prior application of RFRA to state law exceeded Congress's enforcement powers under the Fourteenth Amendment).

trial, defendants have the burden of showing that defendant Conway's actions were narrowly tailored to not burden plaintiffs' religion.

E.    Supervision and Training

Municipalities may be held liable under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury" complained of by plaintiff. Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 694 (1978). "'[A] municipality cannot be held liable' solely for the acts of others, e.g., 'solely because it employs a tortfeasor.'" Los Angeles Cty., Cal. v. Humphries, 562 U.S. 29, 36 (2010) (quoting Monell, 436 U.S. at 691).

"[T]he inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." City of Canton, Ohio v. Harris, 489 U.S. 378, 388 (1989). "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown, 520 U.S. 397, 410 (1997). "Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain that program." Connick v. Thompson, 563 U.S. 51, 61 (2011); Carter v. Morris, 164 F.3d 215, 218 (4th Cir. 1999) (emphasis in original) ("[M]unicipal liability will attach only for those policies or customs having a 'specific deficiency or deficiencies . . . such as to make the specific violation almost bound to happen, sooner or later, rather than merely likely to happen in the long run.'").

Defendant New Bern regularly trains its officers on constitutional law regarding the First Amendment. (See Lucas Dep. (DE 36-4) 10:1–14:2; Conway Dep. (DE 36-3) 15:8–17:17). Plaintiffs fail to point to specific deficiencies in defendant New Bern's officer training program that make the First Amendment violations of the variety in this case bound to happen. See Carter, 164 F.3d at 218. Thus, plaintiffs fail to show deliberate ignorance on the part of defendant New Bern in training its officers. See Connick, 563 U.S. at 61 ("A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train."). The court grants defendant New Bern's motion for summary judgment on plaintiffs' claims for failure to train.

## CONCLUSION

Based on the foregoing, defendants' motion for summary judgment (DE 34) is GRANTED IN PART and DENIED IN PART, and plaintiffs' motion for summary judgment (DE 37) is DENIED. The following claims and defenses are ALLOWED to proceed:

1. Plaintiffs' freedom of speech claim arising from being removed from Middle Street to the public sidewalk pursuant to § 66-84(a), and defendant Conway subsequently placing a beeping utility cart between plaintiffs and Mumfest attendees.

2. Plaintiffs' free exercise of religion claim arising from the same; and

3. Defendant Conway's defense of qualified immunity.

Plaintiffs' other claims are DISMISSED for the reasons set forth by the court above.

Where claims remain for trial, in accordance with case management order entered August 21, 2018, as amended May 30, 2019, this case now is ripe for entry of an order governing deadlines and procedures for final pretrial conference and trial. The parties are DIRECTED to confer and file within 14 days from the date of this order a joint status report informing of 1) estimated trial length; 2) particular pretrial issues which may require court intervention in advance of trial, if any;

and 3) at least three suggested alternative trial dates.  In addition, where mediation was to have occurred by July 31, 2019, and with no showing offered by the parties as to the status of same, said report shall confirm mediation has been undertaken, or identify a date certain for mediation to take place.

SO ORDERED, this the 10th day of March, 2020.


_____
LOUISE W. FLANAGAN
United States District Judge